UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
BAUMANN BUS COMPANY, INC.,

                                        Petitioner/Counter-Claim
                                        Respondent,

                        -against-

TRANSPORT WORKERS UNION OF:
AMERICA, LOCAL 252, AFL-CIO,

                                        Respondent/
                                        Counter-Claimant.
-------------------------------------------------------------------X

For Online Publication Only

**MEMORANDUM & ORDER**
19-cv-02980 (JMA) (AKT)

**FILED**
**CLERK**

3/22/2021 9:27 am

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**APPEARANCES:**

Glenn J. Smith
Howard M. Wexler
Seyfarth Shaw LLP
620 Eighth Avenue
New York, NY 10018
        *Attorney for Petitioner/Counter-Claim Respondent*

Edward J. Groarke
Colleran, O'Hara & Mills, L.L.P.
100 Crossways Park Drive West, Suite 200
Woodbury, NY 11797
        *Attorney for Respondent/Counter-Claimant*

**AZRACK, United States District Judge:**

         Before the Court are respective applications to vacate and confirm the arbitration opinion

and award (the "Award") issued by arbitrator Stanley Aiges (the "Arbitrator") in favor of

respondent Transport Workers Union of America, Local 252, AFL-CIO ("Respondent") pursuant

to the Federal Arbitration Act ("FAA").  (ECF Nos. 26, 26-1.)  Petitioner Baumann Bus Company,

Inc. ("Petitioner") initiated this action by filing a petition (the "Petition") to vacate the Award, to

which Respondent answered and asserted a counterclaim to confirm the Award.  (ECF Nos. 1, 7.)
For the following reasons, the Court **DENIES** Petitioner's Petition to vacate the Award and
**GRANTS** Respondent's Counterclaim seeking to confirm the Award.

## I. BACKGROUND

The following facts are taken from parties' aforementioned filings, as well as the parties'
Joint Local Civil Rule 56(c)(1) Statement (the "Joint Stmt.") and Joint Declaration of Stipulated
Facts (the "Joint Decl."). (ECF Nos. 18 and 19.)  These facts are undisputed unless otherwise
noted.

### A. <u>The Collective Bargaining Agreement and Dispute</u>

Petitioner is a transportation company for school children and Respondent is a labor
organization that acts as the exclusive bargaining agent for drivers and related personnel employed
by Petitioner. (Joint Stmt. ¶¶ 3-4.)  Petitioner and Respondent are parties to a collective bargaining
agreement ("CBA"), which covers full-time and part-time bus drivers, driver's assistants, and
others.  The CBA covers the time period from July 1, 2017 through June 30, 2020.  (Joint Decl. ¶
20; ECF No. 1-3.)  Petitioner and Respondent were previously parties to a CBA that was in effect
from 2014 through June 30, 2017.  (Joint Decl. ¶ 19.)

Pursuant to the CBA, prior to the start of each school year, the drivers and driver's assistants
employed by Petitioner select the bus routes, or "runs," constituting their "bid package" for that
entire academic year. (<u>Id.</u> ¶¶ 23-24.)  Full-time drivers and driver's assistants are those who
regularly perform both A.M. and P.M. runs and are paid a minimum of five or six hours for their
combined runs. (<u>Id.</u> ¶ 24.)  These employees may also include a mid-day or late run in their bid
package depending on availability during the bidding process.  An employee's bid package

comprises all runs that the employee successfully bid on (A.M., P.M., mid-day, and/or late runs).
(Id. ¶ 25.)

The CBA guarantees employees pay for "minimum work hours for any regular school day based on the route requirements," meaning any run that is part of their bid package. (Id. ¶ 26.) The CBA eliminated a past practice whereby employees received pay according to their bid package for up to eight hours a day whenever a contractual holiday occurred. (Id. ¶ 28.) This practice was eliminated as a result of negotiated changes to the "guaranteed weeks" provision in the CBA. (Id. ¶ 29; ECF No. 1-3 at Art. XX ¶ 3.) The guaranteed weeks provision, which is at the heart of this dispute, states that:

> After September 1, 2018, all full time and part time Drivers and Driver's Assistants who have passed their probationary period shall have guaranteed weeks of employment during the school year . . . (c) During the period of the school year bids, the employee will receive five (5) days of pay per week . . . regardless of the days of work scheduled on the school calendar for their bid. There shall be no more than five (5) days' pay for any week (except for such pay resulting from work being performed on a snow day). To be eligible to be paid for any scheduled school closing (except for such pay resulting from work being performed on a snow day) during a guaranteed week the employee must work the full day before and after any scheduled school closing.

(ECF No. 1-3 at Art. XX ¶ 3.) Subsection 3(f) of the provision also states:

> f) Pay for days where the employee's school calendar indicates that their schools are NOT running or there is complete absenteeism is as follows:
>    1) Employees who are not required to work will be paid their daily minimum guarantee.
>    2) Employees who are required to work will be paid their bid package (not to exceed eight (8) hours) or actual hours worked, whichever is greater). Employees who refuse to work as requested, or who fail to report as requested will lose their pay for the day (with the exception of pay for actual hours worked).

(Id. at Art. XX ¶ 3(f).) The CBA does not define the term "daily minimum guarantee."

The specific dispute concerns three days in 2018, September 11, 12, and 19, which were Jewish Holy Days during which the employees' schools were closed and employees were not

3

required to report to work.  These three days at issue occurred during a guaranteed week.  (Joint Decl. ¶ 31.)  On or around September 21, 2018, Petitioner issued paychecks to certain employees, who had both A.M. and P.M. runs as well as a mid-day or late day run, covering the pay periods that included the three days at issue.  Petitioner paid the employees either five or six hours for their A.M. and/or P.M. runs but not for any mid-day or late runs.  (Id. ¶ 32.)  On September 25, 2018, Respondent filed a grievance (the "Grievance") arguing that Petitioner should have paid the employees for mid-day or late runs that occurred during these three days, and therefore, the employees' paychecks should have reflected up to 8 hours per day rather than only 5 or 6 hours. (Id.; ECF No. 1-4.)

**B. Grievance Process**

The grievance process that Respondent initiated requires that two hearings be held, after which the aggrieved party may submit the matter to arbitration.  (Joint Decl. ¶ 35.)  Pursuant to the CBA, if the matter is not resolved at the second mandated hearing, then "within five (5) working days thereafter, the grievance shall be reduced to writing by the aggrieved party and the matter may be submitted to arbitration (i.e., within ten (10) working days of the first meeting). Any grievance not submitted to arbitration within the time periods specified above shall be waived and considered ineligible for arbitration unless the parties agree otherwise in a signed writing." (ECF No. 1-3 at Art. XI.1(c))

On October 3, 2018, the parties held the first hearing, during or after which Petitioner denied Respondent's Grievance.  (Joint Decl. ¶ 36.)  On October 9, 2018, Respondent appealed for a second grievance hearing, which was conducted on October 19, 2018.  (Id. ¶ 37.)  There is a disagreement between the parties as to whether Petitioner's representative orally denied the Grievance at the second hearing.  (Id.)  The parties agree, however, that Petitioner sent a facsimile

4

to Respondent on October 22, 2018 stating that "[t]he Company's position is that the daily minimum guarantee is an a.m. and/or p.m." (Id.) On October 23, Respondent submitted a "Step Three" grievance, which stated that it sought to "go to arbitration." (Id. ¶ 38; ECF No. 1-7.) On October 29, Respondent filed a formal demand for arbitration with the Arbitrator via facsimile. (Joint Decl. ¶ 40; ECF No. 1-9.) After receiving the demand for arbitration, Petitioner indicated via a letter dated November 8, 2018 that it challenged Respondent's timeliness in moving the dispute to arbitration. (Joint Decl. ¶¶ 41-42.)

## C. The Arbitration Hearing

The parties agreed that two issues would be heard and decided by the Arbitrator: (1) "[d]id the Union timely process the instant grievance to arbitration in accordance with the terms of the Agreement?" and (2) "[d]id the Employer violate the Agreement by not paying the grievants for eight hours on September 11, 12 and 19, 2018, which were days that they did not work and on which their schools were not running per the school calendar? If so, what shall be the remedy?" (Id. ¶ 3 (alterations in original).) Petitioner had the burden of proof for the first issue, while Respondent had the burden of proof for the second issue. (Id. ¶ 5.)

The hearing was held on December 5, 2018. (Joint Stmt. ¶ 10.) Joint and individual exhibits were introduced and placed into evidence without objection. (Joint Decl. ¶ 4.) There was no sworn testimony, no opportunity for cross-examination, and no court reporter present. (Id. ¶ 10.) The Arbitrator listened to opening statements from both parties and comments from Respondent's chairperson, Susan Rodriguez, and president, Debra Hagan. However, the Arbitrator found that Hagan's comments were barred by the parol evidence rule. (Joint Decl. ¶¶ 9-10.) After approximately two hours, the Arbitrator declared that the disputed issues were a matter of pure contract interpretation and concluded the hearing, with no objections from either party. (Id. ¶ 11.)

The parties agreed to file post-hearing briefs in support/opposition by January 8, 2019 and the record was closed after they filed their respective briefs.  (Id. ¶ 13; ECF Nos. 1-11 and 1-12.)

On February 19, 2019, the Arbitrator issued the Award.  (Joint Stmt. ¶ 24.)  The Award found that Respondent's October 23, 2018 grievance form was "sufficient to have placed the Employer on notice of the Union's intent to arbitrate. Therefore, since this notice was given within five working days of Step 2, which took place on October 19, 2018, the procedural requirement of Article XI (c) has been satisfied."  (ECF No. 1-1 at 16.)  The Award found that: (1) the Grievance is arbitrable; (2) Petitioner violated the CBA by the amount it paid the grievants for the days at issue; (3) Petitioner is ordered to make the grievants whole by compensating them for the difference between the pay that they received for these days and the amount that they would have received if they worked such days up to a maximum of eight hours per day; and (4) the Grievance is granted.  (Joint Stmt. ¶ 9.)  To date, Petitioner has not honored the Award and continues to pay the affected employees as it did prior to the Grievance.  (Joint Decl. ¶¶ 51-52.)

On May 20, 2019, Petitioner instituted the instant proceeding by filing the Petition to vacate the Award with this Court.  (ECF No. 1.)  On June 17, 2019, Respondent filed an answer and counterclaim to confirm the Award.  (ECF No. 7.)  The parties then filed the Joint Stmt. and Joint Decl.  (ECF Nos. 18 and 19.)  Petitioner filed a memorandum of law in support of its motion to vacate the Award.  (ECF No. 26.)  Respondent filed a memorandum of law in opposition to the motion to vacate and in support of a counterclaim to confirm the Award, (ECF No. 26-1), and both parties filed reply briefs.  (ECF Nos. 26-2, 26-3.)

## II. DISCUSSION

### A. <u>Standard of Review</u>

"The Supreme Court and Second Circuit have repeatedly recognized the strong deference

due to arbitration awards and the arbitral process." <u>Southside Hosp. v. 1199 SEIU United</u>

<u>Healthcare Workers E., AFL-CIO</u>, No. 15-CV-7171, 2018 WL 2075305, at *2 (E.D.N.Y. Feb. 13,

2018), <u>adopted by</u>, 2018 WL 4922916 (E.D.N.Y. Oct. 10, 2018) (citing <u>Moses H. Cone Mem'l</u>

<u>Hosp. v. Mercury Constr. Corp.</u>, 460 U.S. 1, 24 (1983); <u>Scandinavian Reins. Co. v. Saint Paul Fire</u>

<u>& Marine Ins. Co.</u>, 668 F.3d 60, 72 (2d Cir. 2012)).  Indeed, "[t]he arbitrator's rationale for an

award need not be explained, and the award should be confirmed if a ground for the arbitrator's

decision can be inferred from the facts of the case.  Only a barely colorable justification for the

outcome reached by the arbitrator[ ] is necessary to confirm the award." <u>D.H. Blair & Co., Inc. v.</u>

<u>Gottdiener</u>, 462 F.3d 95, 110 (2d Cir. 2006) (internal quotations and citations omitted).

Furthermore, "confirmation of an arbitration award 'is a summary proceeding that merely makes

what is already a final arbitration award a judgment of the court.'" <u>D.H. Blair</u>, 462 F.3d 95 at 110

(quoting <u>Florasynth, Inc. v. Pickholz</u>, 750 F.2d 171, 176 (2d Cir. 1984)).  Therefore, "[a] party

moving to vacate an arbitration award has the burden of proof, and the showing required to avoid

confirmation is very high." <u>Id.</u>

In the context of a collective bargaining agreement, "[a] federal court's review of labor

arbitration awards is narrowly circumscribed and highly deferential—indeed, among the most

deferential in the law." <u>Nat'l Football League Mgmt. Council v. Nat'l Football League Players</u>

<u>Ass'n</u>, 820 F.3d 527, 532 (2d Cir. 2016); <u>see also</u> <u>New York's Health & Human Serv. Employees</u>

<u>Union, 1199/SEIU, AFL-CIO v. Grossman</u>, No. 02-CV-6031, 2007 WL 2907386, at *7 (E.D.N.Y.

Oct. 3, 2007) ("judicial review of an arbitrator's interpretation of a collective bargaining agreement

is extremely limited.") (citing Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 509 (2001)).  Indeed, "[i]t is well-established that a court must confirm an arbitration award as long as it draws its essence from the collective bargaining agreement and is not the arbitrator's own brand of industrial justice." Trustees of Empire State Carpenters Annuity, Apprenticeship, Lab.-Mgmt. Cooperation, Pension & Welfare Funds v. Display Presentations, Ltd., No. 14-CV-4265, 2016 WL 11481196, at *4 (E.D.N.Y. July 12, 2016), adopted sub nom. by, Trustees of Empire State Carpenters Annuity v. Display Presentations, Ltd., 2016 WL 4212261 (E.D.N.Y. Aug. 10, 2016) (internal quotations omitted).  "A court is not authorized to review the arbitrator's decision on the merits; its role is simply to determine whether the arbitrator acted within the scope of his authority as defined by the collective bargaining agreement." Trustees of Ne. Carpenters Health, Pension, Annuity, Apprenticeship, & Lab. Mgmt. Cooperation Funds v. Tiki Indus., Inc., No. 19-CV-3295, 2021 WL 242266, at *4 (E.D.N.Y. Jan. 25, 2021) (quoting New York City & Vicinity Dist. Council of United Bhd. of Carpenters & Joiners of Am. v. Ass'n of Wall-Ceiling & Carpentry Indus. of N.Y., Inc., 826 F.3d 611, 618 (2d Cir. 2016)).  "Thus, as long as the arbitrator was even arguably construing or applying the contract and acting within the scope of his authority and did not ignore the plain language of the contract, the award should ordinarily be confirmed." Id. (internal quotations omitted). "Upon the denial of a motion for vacatur, the Court must confirm an arbitration award." AmeriCredit Fin. Servs., Inc. v. Oxford Mgmt. Servs., 627 F. Supp. 2d 85, 102 (E.D.N.Y. 2008); see also 9 U.S.C. § 9.

The Federal Arbitration Act ("FAA") identifies four bases upon which a district court may vacate an arbitration award:

> (1) where the award was procured by corruption, fraud, or undue means; (2) where there was evident partiality or corruption in the arbitrators, or either of them; (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or

of any other misbehavior by which the rights of any party are prejudiced; or (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).  Additionally, the Second Circuit "has held that the court may set aside an arbitration award if it was rendered in manifest disregard of the law . . . This inquiry encompasses situations where the arbitrator's award is in manifest disregard of the terms of the parties' relevant agreement."  Weiss v. Sallie Mae, Inc., 939 F.3d 105, 109 (2d Cir. 2019) (internal quotations and alterations omitted).  This doctrine, however, is one "of last resort" reserved for "those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent, but where none of the provisions of the FAA apply."  Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S, 333 F.3d 383, 389 (2d Cir. 2003).

A petition to confirm an arbitral award is "treated as akin to a motion for summary judgment."  Ferrand v. Mystique Brands LLC, No. 20-CV-5933, 2021 WL 119572, at *7 (S.D.N.Y. Jan. 13, 2021) (quoting D.H. Blair, 462 F.3d at 109).  A court will grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The movant bears the burden of demonstrating that "no genuine issue of material fact exists."  Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).  To determine whether such a dispute of material fact exists, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003).

**B. The Present Case**

Petitioner makes three arguments as to why the Award should be vacated: (1) the Arbitrator engaged in misconduct by not conducting an evidentiary hearing; (2) the Arbitrator's decision as

to whether the Grievance was timely does not draw its essence from the CBA; and (3) the Arbitrator's decision on the merits of the Grievance does not draw its essence from the CBA and was rendered with manifest disregard for the law. (ECF Nos. 26, 26-2.) The Court addresses each argument in turn.

### 1. Evidentiary Hearing

Under Section 10(a)(3) of the FAA, vacatur is warranted if the arbitrator was guilty of misconduct "in refusing to hear evidence pertinent and material to the controversy." 9 U.S.C. § 10(a)(3). Section 10(a)(3) permits vacatur only if the misconduct amounts to violation of "fundamental fairness." Tempo Shain Corp. v. Bertek, Inc., 120 F.3d 16, 20 (2d Cir. 1997). "Arbitral misconduct typically arises where there is proof of either bad faith or gross error on the part of the arbitrator." In re Cragwood Managers, L.L.C. (Reliance Ins. Co.), 132 F.Supp.2d 285, 287 (S.D.N.Y. 2001) (internal quotations marks and modifications omitted). "Arbitrators must give each of the parties to the dispute an adequate opportunity to present its evidence and argument, but need not follow all the niceties observed by the federal courts such as the Federal Rules of Civil Procedure or the Federal Rules of Evidence, nor hear all of the evidence proffered by a party." Oracle Corp. v. Wilson, 276 F. Supp. 3d 22, 30-31 (S.D.N.Y. 2017) (internal citations omitted). "There is also no bright line rule that requires arbitrators to conduct oral hearings." Id. at 29. To show arbitral misconduct, "the challenging party must show that his right to be heard has been grossly and totally blocked, and that this exclusion of evidence prejudiced him." Id. (internal citations omitted).

Here, the Arbitrator conducted an oral hearing. However, Petitioner argues that the Arbitrator engaged in misconduct at the hearing because: there was no sworn testimony; the only facts entered into the record were the joint exhibits and Respondent's exhibits including the CBA,

grievance forms, demand for arbitration, and the October 22, 2018 facsimile from Petitioner; and the parties were not allowed to enter parol evidence into the record. (ECF No. 26 at 5-6.) Petitioner contends, without any support, that because the Arbitrator did not conduct an evidentiary hearing "he was limited to a finding that the language [of the CBA] was clear and unambiguous. Instead, the Arbitrator found the language to be ambiguous and thereafter elected to re-write the parties' CBA as he desired, based upon facts he assumed." (Id.) Petitioner argues, therefore, the principles of fundamental fairness were violated.

The Court finds this argument unpersuasive. There is "no evidence on the record which demonstrates that the Arbitrator prevented [Petitioner] from presenting pertinent and material evidence before []he issued the" Award. Oracle Corp., 276 F. Supp. 3d at 30-31. To the contrary, six joint exhibits and two exhibits from Respondent were introduced and placed into evidence. The Arbitrator listened to opening statements from both parties and comments from Respondent's chairperson and president. (Joint Decl. ¶¶ 4, 6-10.) The record reflects that the only parol evidence that was offered and not considered was testimony from Respondent's president. (Id. ¶¶ 9-10.) Petitioner does not point to anywhere in the record where it attempted to introduce exhibits or call witnesses that the Arbitrator did not allow. Nor does Petitioner point to anywhere it objected to the way the Arbitrator conducted the hearing. Furthermore, Petitioner did not object when "the arbitrator declared that the disputed issues were a matter of pure contract interpretation and there was no need to proceed further," thereby concluding the hearing. (Id. ¶ 11.) The Arbitrator then permitted both parties to submit post-hearing briefs, in which Petitioner could have asked for an evidentiary hearing, or explained what further evidence should considered at such a hearing, but did not. (Id. ¶ 12; ECF No. 1-12.) "Courts have held that a party is not denied a fundamentally fair hearing if it did not avail itself of the opportunity to be heard by proffering further evidence,

seeking discovery, or requesting an evidentiary hearing." Oracle Corp., 276 F. Supp. 3d at 30-31 (collecting cases).

In its reply brief, Petitioner does not argue that there is specific evidence that it requested to present but was not allowed to, but, rather, argues that because "the Arbitrator's refusal of the Union's testimonial, evidence indicated that the Arbitrator would decide the issue on language only," "there was no reason for the [Petitioner] to object." (ECF No. 26-2 at 13.) Petitioner cites no authority in support of proposition. Moreover, this decision by the Arbitrator regarding testimony proffered by Respondent does not excuse Petitioner's failure to even attempt to introduce evidence. Petitioner fails to explain the relevance of the testimony of Respondent's president, and also does not identify what evidence Petitioner would have presented or what that evidence would have shown. Petitioner does not even explain which provision(s) of the CBA that it would have wanted to present parol evidence about or which specific provision(s) were addressed in the testimony of Respondent's president. See Owoyemi v. JPMorgan Chase & Co., No. 10-CV-6001, 2014 WL 3809799, at *4 (E.D.N.Y. July 31, 2014) (finding there was no arbitrator misconduct where arbitrator did not admit three of plaintiff's exhibits and in its motion for vacatur plaintiff did "not explain the nature of the exhibits or their relevance" and instead "present[ed] conclusory arguments stating that '[t]hese [e]xhibits were very crucial and material.'").

Finally, to the extent Petitioner argues that the Arbitrator misapplied the rule of parol evidence by not allowing the testimony of Respondent's president into evidence and then considering the parties' intent in construing the terms of the CBA, arbitrators "need not follow all the niceties observed by the federal courts such as the Federal Rules of Civil Procedure or the Federal Rules of Evidence, nor hear all of the evidence proffered by a party." Oracle Corp., 276

F. Supp. 3d at 29-30. Furthermore, the "misapplication of rules of contract interpretation does not rise to the stature of a manifest disregard of law." Sempra Energy v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., No. 06-CV-6107, 2006 WL 3147155, at *2 (S.D.N.Y. 2006) (internal quotations omitted). Courts in this circuit have specifically found that misapplication of the parol evidence rule does not warrant vacatur. Giller v. Oracle USA, Inc., No. 11-CV-02456, 2012 WL 467323, at *6 (S.D.N.Y. Feb. 14, 2012), aff'd, 512 F. App'x 71 (2d Cir. 2013) (stating that a "petition alleging that the arbitrator failed to apply a clearly applicable principle of contract interpretation similarly has been found to exceed the scope of judicial review under the manifest disregard standard" and finding that petitioner's claims that arbitrator misapplied New York's parol evidence rule did not constitute manifest disregard for the law). Petitioner's arguments concerning the Arbitrator's purported misapplication of the parole evidence rule are absurd given that the Petitioner never sought to call a witness or introduce any parol evidence and has never even identified what evidence it would have introduced before the Arbitrator.

Accordingly, the Court finds that Petitioner has not shown it was denied a fundamentally fair hearing.

**2. Arbitrator's Decision on Timeliness**

Petitioner argues that the Arbitrator exceeded his authority and ignored the essence of the CBA when he determined Respondent's request for arbitration was timely. The relevant language in Art. XI.1 of the CBA states:

> a) The matter shall first be taken up between the Employer and Shop Steward within five (5) working days.
>
> b) If the dispute is not resolved as provided in paragraph a) above, within five (5) working days thereafter, a meeting shall be held between the Employer and the Union delegate.
>
> c) If the dispute is not resolved as provided in paragraph b) above, within five (5) working days thereafter, the grievance shall be

> reduced to writing by the aggrieved party and the matter may be
> submitted to arbitration (i.e., within ten (10) working days of the
> first meeting). Any grievance not submitted to arbitration within the
> time periods specified above shall be waived and considered
> ineligible for arbitration unless the parties agree otherwise in a
> signed writing.

(ECF No. 1-3 Art. XI.1) (emphasis added).

Petitioner argues that, under its reading of paragraph Article XI.1(c), Respondent did not

meet the timeline to bring the dispute to arbitration for two reasons: (1) Respondent had ten

working days from the first meeting on October 3 or 4, 2018 to move the dispute to arbitration;

and (2) Respondent had five working days from the second meeting on October 19, 2018, where

it argues the Grievance was orally denied, to move the dispute to arbitration.  Respondent moved

the matter to Arbitration on October 29, 2018 (six working days after the second meeting) and,

therefore, Petitioner argues it is time-barred under both theories.  (ECF No. 26 at 6-7.)  On this

point, the Arbitrator found:

> These two time limits [in Art. XI.1(c)] function in tandem only when Step 2 occurs within
> five working days of Step 1, as specified in paragraph (b).  However, when the parties delay
> the timing of Step 2, as occurred here, enforcement of the latter time limit of paragraph (c)
> creates the anomaly of compelling the grievance to be submitted to arbitration before the
> parties have conducted a Step 2 meeting.

(ECF No. 1-1 at 15.)  Further: "the governing time limit for submitting a grievance to arbitration

is the initial one specified in paragraph (c), namely, within five working days following Step 2".

(Id. at 16.)  With regard to the five-day time limit, the Arbitrator found that Respondent's October

23, 2018 grievance form was "sufficient to have placed the Employer on notice of the Union's

intent to arbitrate."  (Id.)  The Arbitrator concluded that, "therefore, since this notice was given

within five working days of Step 2, which took place on October 19, 2018, the procedural

requirement of Article XI (c) has been satisfied."  (Id.)

14

Petitioner contends that the Arbitrator "improperly disregarded and then modified unambiguous contract language" in interpreting the language in Art. XI.1.  Specifically, Petitioner takes issue with the fact that the Arbitrator analyzed the ten- and five-day time limits "in tandem." (ECF No. 26 at 7.)  Petitioner also argues that the Arbitrator exceeded his powers "when he concluded that 'it could not have been the parties' intent' when the parties 'delay[ed] the timing of Step 2, as occurred here' to then 'compel[] the grievance to be submitted to arbitration before the parties have conducted a Step 2 meeting.'"  (Id.)  Finally, Petitioner argues that the Arbitrator exceeded his powers under the CBA in ruling that Respondent's October 23, 2018 notice of intent to arbitrate the Grievance was sufficient under the CBA.  (Id. at 8.)

Under 9 U.S.C. § 10(a)(4), vacatur is warranted when an arbitrator's decision exceeds his powers.  Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv., 754 F.3d 109, 112-13 (2d Cir. 2014); 9 U.S.C. § 10(a)(4).  The Second Circuit has held that the "crux of the excess-of-powers standard is whether the arbitrator's award draws its essence" from the agreement.  Id. (internal quotation marks omitted).  A court is "not authorized to review the arbitrator's decision on the merits."  Nat'l Football League, 820 F.3d at 536.  Rather, the Court's role is to determine "whether the arbitrator acted within the scope of his authority as defined by the collective bargaining agreement."  Id.  Thus, if "the arbitrator was even arguably construing or applying the contract and acting within the scope of his authority and did not ignore the plain language of the contract," the award should be confirmed.  Id. (internal quotation marks omitted).

The Supreme Court has explained:

It is not enough . . . to show that the [arbitrator] committed an error—or even a serious error. Because the parties bargained for the arbitrator's construction of their agreement, an arbitral decision even arguably construing or applying the contract must stand, regardless of a court's view of its (de)merits. . . . So the sole question for [the court] is whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong.

15

Oxford Health Plans LLC v. Sutter, 569 U.S. 564, 573 (2013) (internal quotations omitted). However, vacatur is appropriate if the award "contradicts an express and unambiguous term of the contract or . . . so far departs from the terms of the agreement that it is not even arguably derived from the contract."  United Bhd. of Carpenters v. Tappan Zee Constructors, LLC, 804 F.3d 270, 275 (2d Cir. 2015).  Thus, an award may be vacated if it does not "draw its essence from the collective bargaining agreement" but reflects instead "the arbitrator's own brand of industrial justice."  Nat'l Football League, 820 F.3d at 536 (internal quotation marks omitted).

Here, the CBA vests the Arbitrator with "final and binding" decision-making authority over disputes brought to arbitration.  (ECF No. 1-3, Art. XI.)  There is no textual limit to this authority except that the Arbitrator is not allowed to amend, modify, alter, add, or subtract from the CBA. (Id.)  The Arbitrator's decision on the issue of the time limits clearly draws its essence from the CBA.  The Arbitrator explicitly analyzed the language of Art. XI.1 of the CBA in making his determination that the five-day time limit applied and that Respondent's notice of intent to arbitrate was sufficient.  (See, e.g., ECF No. 1-1 at 15 ("These two time limits [in Art. XI.1(c)] function in tandem only when Step 2 occurs within five working days of Step 1, as specified in paragraph (b). However, when the parties delay the timing of Step 2, as occurred here, enforcement of the latter time limit of paragraph (c) creates the anomaly . . ."); Id. at 16 ("the governing time limit for submitting a grievance to arbitration is the initial one specified in paragraph (c) . . .").)  Therefore, the Arbitration Award is based upon the terms of the CBA.  Accordingly, there is no support for the argument that the Arbitrator "impermissibly applied his own brand of industrial justice."  See Southside Hosp., 2018 WL 2075305, at *4 (finding that an award drew its essence from a collective bargaining agreement where the award was "directly based on the Arbitrator's examination of the CBA.").

16

Petitioner's argument for a different reading of the time limits in the CBA, or that the Arbitrator erroneously applied the CBA, is unavailing.  Under Section 10(a)(4) the question for a judge is not whether the arbitrator interpreted the parties' CBA correctly, but whether he construed it at all.  Oxford Health Plans LLC, 569 U.S. at 572-73 ("So long as the arbitrator was 'arguably construing' the contract [] a court may not correct his mistakes under § 10(a)(4).  The potential for those mistakes is the price of agreeing to arbitration . . . It is the arbitrator's construction [of the contract] which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his. The arbitrator's construction holds, however good, bad, or ugly.") (internal quotations omitted).  Here, the Arbitration Award is directly based on the Arbitrator's construction of the CBA.

Where the party seeking vacatur puts forth a competing interpretation of an agreement, courts will confirm an arbitration award where the "arbitrator's reading of the contract provided a barely colorable justification for [his finding]" and where the interpretation advanced by the party seeking vacatur "may have been plausible, but it was not sufficiently clear and explicit such that a refusal to apply it would require vacatur."  Loc. 210 Warehouse & Prod. Emps. Union, AFL-CIO v. Env't Servs., Inc., 221 F. Supp. 3d 306, 317 (E.D.N.Y. 2016) (internal quotations omitted).  In this case, the provisions of the CBA regarding time limits to bring the dispute to arbitration were at least arguably ambiguous in multiple respects.  While Petitioner's arguments—that the dispute needed to be brought to arbitration within five days of the first meeting and that Respondent's October 23 grievance was insufficient to submit the matter to arbitration—are, perhaps, plausible, Petitioner's interpretation is far from "sufficiently clear and explicit" that the Arbitrator's decision should be vacated.  Rather, the Arbitrator's decision put forth more than the "reasonably colorable

justification" for his decision and was a reasonable interpretation of the contract provisions at issue.

Accordingly, the Court finds that Petitioner has not shown that vacatur would be proper on this basis.

### 3. Arbitrator's Decision on the Merits of the Grievance

Finally, Petitioner argues that the Arbitrator's decision on the merits of the Grievance does not draw its essence from the CBA and is a manifest disregard of the law.  Specifically, Petitioner takes issue with the Arbitrator's interpretation of the term "daily minimum guarantee" which was used in Article XX.3 of the CBA, but not defined.  (ECF No. 26 at 8-10.)  First, Petitioner argues that because the Arbitrator found that the term was ambiguous, he was required to conduct an evidentiary hearing.  The Court explained above why this argument is unavailing.  See supra at Section B.1.

Second, Petitioner argues that "[t]he Arbitrator inappropriately concluded that the term 'daily minimum guarantee' is 'essentially synonymous' with the 'employees regular rate of pay with a day on which he/she works.'  The Arbitrator's conclusion is a clear manifestation that the Arbitrator exceeded his powers under the CBA."  (ECF No. 26 at 8-9.)  The Court finds this argument unavailing for several reasons.  The Arbitrator's decision on this issue states:

> As an Arbitrator, my role is a limited one.  It is to interpret the parties' Agreement as written. If it is clear on its face, and if from the parties' chosen words their intentions are manifest, then I am without power or authority to deviate from the text.  Rather, if the contract language is clear and unambiguous, I must enforce it according to the plain meaning of its terms. I must also endeavor to construe the agreement as a whole.  Doing so requires that I adopt a reasonable construction that gives effect to all words in light of their context and avoids nullifying language adopted by the parties. As well, it is fundamental that the party asserting the violation of the agreement must bear the burden of proving such violation occurred.
>
> With these principles in mind, I turn to the issue of whether the Employer violated the Agreement by the amount it paid the grievants for the days at issue.  After a careful review

18

of the record, and thorough consideration of the parties' arguments, I am persuaded that on balance, the Union's grievance should be sustained.  My reasons follow:

Article XX (3)(f) is controlling here.  It plainly provides that days on which employees' school calendar specifies their school is not running, they are to be paid "their daily minimum guarantee."  The parties, to be sure, did not define the term "their daily minimum guarantee."  They never precisely specified what they intended that term to mean.  In effect, the term must be regarded as ambiguous.

In interpreting ambiguous language, an arbitrator must strive to give it a rational construction. That is, one that most reasonably reflects the parties' intention.

Here, by utilizing the pronoun "their" in Article XX (3)(f)(l), the parties plainly intended to tie the daily minimum guarantee to each individual employee.  That strongly suggests that they intended to provide the employees with the amount that they are paid on a normal workday.  There is no reason whatsoever to conclude that the parties intended to lessen the amount that an employee receives on a day that he/she does not work because his/her school is not running per the calendar.  Rather, when read in context, the term strikes me as indistinguishable from the amount the employee would receive if working.  In short, the term daily minimum guarantee is essentially synonymous with the employee's regular rate of pay with a day on which he/she works.

If the parties intended to have an employee receive less than that amount on a day he/she is not working because his/her school is not running, they could have easily expressed that intent.  Stated otherwise, if the parties had intended instead for Article XX (3)(f)(l) to provide employees only pay for their A.M. and P.M. runs, they would have said so.  They did not.  I am unwilling to read such a limitation into the text.

This ruling is fully consistent with the concept of the Guaranteed Week, which they parties effected with the introduction of Article XX (3), as of September 2018.  The addition of this provision was clearly designed to stabilize earnings by providing that employees shall be paid for school closings an amount equal to that which they would otherwise ordinarily be paid.

(ECF No. 1-1 at 23-25.)

First, the Arbitrator's interpretation of the term "daily minimum guarantee" clearly draws

its essence from the CBA.  The Arbitrator based his decision on the language of Article XX.3 and

the CBA as whole.  (See, e.g., ECF No. 1-1 at 23 ("As an Arbitrator, my role . . . is to interpret the

parties' Agreement as written.  If it is clear on its face, and if from the parties' chosen words their

intentions are manifest, then I am without power or authority to deviate from the text.  Rather, if

the contract language is clear and unambiguous, I must enforce I according to the plain meaning of its terms. I must also endeavor to construe the agreement as a whole.  Doing so requires that I adopt a reasonable construction that gives effect to all words in light of their context and avoids nullifying language adopted by the parties."); Id. at 24 ("In interpreting ambiguous language, an arbitrator must strive to give it a rational construction.  That is, one that most reasonably reflects the parties' intention.  Here, by utilizing the pronoun 'their' in Article XX.3(f)(1), the parties plainly intended to tie the daily minimum guarantee to each individual employee. That strongly suggests that they intended to provide the employees with the amount that they are paid on a normal workday."); Id. at 24-25 ("If the parties intended to have an employee receive less than that amount on a day he/she is not working because his/her school is not running, they could have easily expressed that intent.  Stated otherwise, if the parties had intended instead for Article XX (3)(f)(1) to provide employees only pay for their A.M. and P.M. runs, they would have said so. They did not.  I am unwilling to read such a limitation into the text.")  Therefore, the Arbitrator explicitly based the Award upon the terms of the CBA.  Accordingly, there is no support for the argument that the Arbitrator "exceeded his powers under the CBA."  (ECF No. 26 at 9.)  Under Section 10(a)(4), the question for a judge is not whether the arbitrator interpreted the parties' CBA correctly, but whether he construed it at all.  Oxford Health Plans LLC, 569 U.S. at 573. Furthermore, the term "daily minimum guarantee" is ambiguous.  While Petitioner's arguments— that "daily minimum guarantee" only includes A.M. and/or P.M runs—is, perhaps, plausible, Petitioner's interpretation is far from "sufficiently clear and explicit" that the Arbitrator's decision should be vacated.  See Loc. 210, 221 F. Supp. 3d at 317.  Rather, the Arbitrator's decision put forth more than the "reasonably colorable justification" for his decision and was a reasonable interpretation of the contract provisions at issue.

20

Second, a court may "set aside an arbitration award if it was rendered in manifest disregard of the law." Zurich Am. Ins. Co. v. Team Tankers A.S., 811 F.3d 584, 588 (2d Cir. 2016) (internal citation omitted). The Second Circuit applies a two-prong test for determining whether an arbitrator has manifestly disregarded the law: (1) whether the governing law that the arbitrator allegedly ignored was well-defined, explicit, and clearly applicable and (2) whether the arbitrator knew of, but intentionally ignored, the existence of a clearly governing legal principle. Westerbeke Corp. v. Daihatsu Motor Co., 304 F.3d 200, 209 (2d Cir. 2002). The party seeking to vacate the award bears the burden of proving both prongs. Id.

Petitioner argues that the Arbitrator disregarded the rules of statutory interpretation, specifically, unius est exclusio alterius (the expression of one thing is the exclusion of the other) in finding that the term "daily minimum guarantee" was "essentially synonymous with the employee's regular rate of pay with a day on which he/she works." (ECF No. 1-1 at 24; ECF No. 26 at 10.) Petitioner has plainly not met its burden under this doctrine. Petitioner fails to explain why this rule of statutory construction was clearly applicable, or whether the Arbitrator intentionally ignored it. "The manifest disregard doctrine is severely limited, and extremely deferential to arbitrators. The doctrine is one of last resort—its use is limited only to those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent, but where none of the provisions of the FAA apply." Pacheco v. Beverage Works NY, Inc., No. 14-CV-5763, 2016 WL 8711094, at *4 (E.D.N.Y. Sept. 30, 2016) (internal quotations and alterations omitted). That is not the case here. Furthermore, even if the Arbitrator did misapply a rule of contract interpretation, "misapplication of rules of contract interpretation does not rise to the stature of a manifest disregard of law." Sempra Energy, 2006 WL 3147155, at *2 (internal

21

quotations and alterations omitted); see also Giller, 2012 WL 467323, at *6 (stating that a "petition alleging that the arbitrator failed to apply a clearly applicable principle of contract interpretation similarly has been found to exceed the scope of judicial review under the manifest disregard standard").

Accordingly, the Court finds that Petitioner has not shown that vacatur would be proper on this basis.

### III. CONCLUSION

For the foregoing reasons, **DENIES** Petitioner's Petition to vacate the Award the Court and **GRANTS** Respondent's Counterclaim seeking confirmation of the Award.

The Clerk of Court is directed to enter judgment in Respondent's favor confirming the award and close this case.

**SO ORDERED.**

Dated:  March 22, 2021
        Central Islip, New York

                                    /s/   (JMA)
                                    JOAN M. AZRACK
                                    UNITED STATES DISTRICT JUDGE